*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

MARK BESZKA,

       Plaintiff-Appellee,

v

LESLEE MARIE BESZKA,

       Defendant-Appellant.

UNPUBLISHED
March 21, 2024

No. 365254
Oakland Circuit Court
Family Division
LC No. 2013-807334-DM

---

MARK BESZKA,

       Plaintiff-Appellee,

v

LESLEE MARIE BESZKA, also known as LESLEE
MARIE POEGEL,

       Defendant-Appellant.

No. 367459
Oakland Circuit Court
Family Division
LC No. 2013-807334-DM

---

Before: CAVANAGH, P.J., and JANSEN and MALDONADO, JJ.

PER CURIAM.

In Docket No. 365254, defendant-mother appeals by right the trial court's order granting plaintiff-father sole legal and physical custody of the parties' minor daughter, AB (d/o/b 02/16/2012). In Docket No. 367459, defendant-mother appeals by leave granted[1] the trial court's

---

[1] See *Beszka v Beszka*, unpublished order of the Court of Appeals, entered August 24, 2023 (Docket No. 367459).

order granting plaintiff-father's request to change AB's school after the change in custody. We affirm in both dockets.

## I. BASIC FACTS

The parties married in October 2008 and had AB in February 2012. Plaintiff-father sued for divorce in April 2013. The trial court entered a judgment of divorce in January 2014, which gave the parties joint legal and physical custody of the child. Eventually, the trial court provided that the parties had parenting time during alternating weeks with standard provisions for holidays and vacations.

The parties began battling over custody and parenting time almost immediately. In May 2017, the trial court appointed Katherine Zopf to serve as a guardian ad litem (GAL) in the hope that she might facilitate better cooperation. Zopf helped the parties with various disputes over the ensuing months, and she filed several reports with the court. Zopf arranged for the parties to have the help of a coparenting counselor, Toby Beach, and she arranged for the child to have therapy with Dr. John Cotter.

In November 2021, Zopf filed a report in which she advised the trial court about several concerning events. She wrote that there was evidence that, beginning in March 2021, defendant-mother had begun speaking to mandatory reporters who worked with AB and told them that the child told her that she was being abused in plaintiff-father's household. Zopf wrote that AB did not directly report any abuse to school personnel or Dr. Cotter; it was defendant-mother alone who reported it. Zopf wrote that someone reported to Children's Protective Services (CPS) that plaintiff-father's new wife was abusing AB. Zopf wrote that, when interviewed in defendant-mother's care, AB reported that her stepmother struck her leg, but she then provided inconsistent statements when interviewed at her school. When interviewed using a forensic protocol, AB reported that her mother cried constantly when they spoke during plaintiff-father's parenting time because she wanted AB to come home. AB also told the investigator that her mother wanted her to "pick" with whom she would live and told AB that it was her decision to make. Zopf informed the trial court that AB had not reported any abuse to any person, including Zopf, before the event at issue, and had not reported anything since. Zopf was concerned that the real problem was that defendant-mother was unable to accept a joint-custody arrangement and could not encourage AB to have a healthy relationship with her father. She stated that AB at one point whispered to Zopf that she wanted more time with " 'Mark.' "

Zopf also discussed the continuous battles over AB's dance classes. Defendant-mother had been enrolling AB in more dance classes than plaintiff-father felt was age appropriate. AB even expressed a desire to participate in other activities, which she could not do because of the number of dance classes. Defendant-mother eventually agreed that certain dance classes would only occur during her parenting time, but defendant-mother then told AB that the reason she was not attending more classes was because of plaintiff-father, and that created conflict between AB and her father. Defendant-mother also used the parties' agreement on the scheduling of dance events to cause conflict between AB and her father.

Zopf told the trial court that defendant-mother also scheduled a Halloween party, that was set to end at midnight, knowing that AB would have to go to her father's home at 8:30 p.m.

-2-

Predictably, the child was angry that she had to leave and called plaintiff-father to complain, which placed him in a difficult situation. Somebody took a video of this call, and plaintiff-mother sent the video to the parties' coparenting therapist. Zopf opined that defendant-mother's actions were harmful and deliberate: "Mother fails and/or refuses to recognize or acknowledge how harmful her behavior is to AB. Unfortunately, it appears that Mother is very cognizant of how disruptive her behavior is to AB's relationship with Father, thus her refusal to change."

Finally, Zopf informed the trial court about an incident involving a police welfare check. Apparently, AB was with plaintiff-father and her stepmother, and they asked AB to clean her room. AB became frustrated with the process. After AB contacted defendant-mother, police officers arrived to perform a welfare check on the basis of allegations that plaintiff-father and AB's stepmother were arguing. AB expressed confusion about why her mother would call the police.

Zopf stated that the recent events had demonstrated proper cause or a change of circumstances that warranted revisiting custody. Zopf stated that she could not independently move for a change in custody because she was appointed to serve only as a GAL. She nevertheless believed that the trial court should at least hold a hearing on the recent events to explore the clear violations of the parenting-time orders. Plaintiff-father moved to adopt Zopf's recommendations later that same month. On the basis of that motion, the trial court referred the dispute over custody and parenting time to a referee.

The referee conducted an evidentiary hearing over several days beginning in January 2022 and entered her findings of fact and proposed order in May 2022. After discussing the evidence, the referee concluded that plaintiff-father demonstrated by clear and convincing evidence that he should be given sole legal custody of AB because defendant-mother had shown that she was unable to coparent with him. The referee recommended that defendant-mother be given parenting time every other weekend and included a provision in the proposed order that required plaintiff-father to keep AB at her current school and in her "current activities" unless otherwise ordered by the trial court.

Defendant-mother objected to the referee's proposed order in June 2022. The trial court held a de novo hearing and ultimately adopted the referee's recommended order in February 2023.[2] At the de novo hearing, the court limited the presentation of evidence to that which was not available for presentation at the referee hearing. At the conclusion, the court awarded plaintiff-father sole legal and physical custody of AB, but it stated that AB should remain at her current school and "in her current activities unless otherwise ordered by the Court." Consistent with the recommendations, the court gave defendant-mother parenting time every other weekend from Fridays after school to Sunday.

In March 2023, defendant-mother appealed by right the trial court's order changing custody.

Plaintiff-father moved for permission to change AB's dance studio and school in May 2023. Defendant-mother opposed the request, and the trial court conducted an evidentiary

---

[2] The delay was caused by difficulties with obtaining transcripts from the referee hearing.

hearing to resolve the dispute in August 2023. The trial court found that the change in schools was in AB's best interests, but that the change in dance studios would not be in her best interests. For that reason, in August 2023, the trial court entered an order allowing the change in school but denying the change in dance studio.

Defendant-mother applied for leave to appeal that decision later that same month. This Court's clerk assigned Docket No. 367459 to that appeal. This Court granted leave to appeal and consolidated the appeals on its own motion. See *Beszka v Beszka*, unpublished order of the Court of Appeals, entered August 24, 2023 (Docket No. 367459).

## II. STANDARDS OF REVIEW

Appellate review of the trial court's custody decision is limited: "all orders and judgments of the circuit court shall be affirmed on appeal unless the trial judge made findings of fact against the great weight of evidence or committed a palpable abuse of discretion or a clear legal error on a major issue." MCL 722.28. A finding of fact is against the great weight of the evidence if the evidence adduced at the hearing "clearly preponderates in the opposite direction." *McIntosh v McIntosh*, 282 Mich App 471, 474; 768 NW2d 325 (2009).[3] This Court reviews a trial court's custody decision for an abuse of discretion. *Shulick v Richards*, 273 Mich App 320, 323; 729 NW2d 533 (2006). This Court will conclude that a trial court abused its discretion regarding a custody dispute only when the trial court's exercise of discretion "is so palpably and grossly violative of fact and logic that it evidences a perversity of will, a defiance of judgment, or the exercise of passion or bias." *Geering v King*, 320 Mich App 182, 188; 906 NW2d 214 (2017) (quotation marks and citation omitted). A trial court commits a clear legal error when it "incorrectly chooses, interprets, or applies the law." *Dailey v Kloenhamer*, 291 Mich App 660, 664-665; 811 NW2d 501 (2011).

## III. DOCKET NO. 365254: CHANGE IN CUSTODY

## A. PRESERVATION

Defendant-mother argues that the trial court erred when it summarily referred plaintiff-father's motion for a change in custody to the referee because of the GAL's recommendation that the recent acts by defendant-mother constituted proper cause or a change of circumstances within the meaning of MCL 722.27(1)(c). She argues that the trial court had to hold an evidentiary hearing, make the necessary findings of fact, and independently determine whether plaintiff-father

---

[3] Defendant-mother repeatedly states in her brief on appeal that the trial court's findings were not supported by the great weight of the evidence at the hearing. This recitation appears to conflate this Court's standard of review with the burden of proof at the hearing. This Court reviews a trial court's findings to determine whether the findings were against the great weight of the evidence. Plaintiff-father did not have the burden to prove by the great weight of the evidence that a change in custody was warranted; he only had to prove it by clear and convincing evidence. See *Stoudemire v Thomas*, 344 Mich App 34, 44; ___ NW2d ___ (2022).

met the threshold for revisiting custody before allowing the referee to conduct a full best interests hearing.

To preserve this claim of error for appellate review, defendant-mother had to raise it in the trial court. See *Glasker-Davis v Auvenshine*, 333 Mich App 222, 227; 964 NW2d 809 (2020). Defendant-mother responded to the GAL's report and plaintiff-father's motion, but she did not argue that the trial court could not rely on the GAL's report and did not argue that there were questions of fact that required an evidentiary hearing before the referee could conduct a hearing. Therefore, defendant-mother failed to preserve this claim of error for appellate review. See *Id*. In civil cases, other than those involving the termination of parental rights, a party waives a claim of error that the party did not properly preserve by bringing the issue to the trial court's attention. *Tolas Oil & Gas Exploration Co v Bach Servs & Mfg, LLC*, ___ Mich App ___, ___ & n 3; ___ NW2d ___ (2023) (Docket No. 359090); slip op at 3 & n 3. Although this Court has the discretion to consider issues that were not properly preserved in the trial court, this Court should exercise its discretion only when exceptional circumstances warrant review. *Bailey v Schaaf*, 304 Mich App 324, 345-346; 852 NW2d 180 (2014), vacated not in relevant part 497 Mich 927 (2014).

The purpose behind the threshold requirement for holding custody hearings is to prevent the disruptions caused by conducting an evidentiary hearing regarding custody absent adequate indications that the motion involves changed circumstances or a proper cause that would warrant the intrusion. See *Vodvarka v Grasmeyer*, 259 Mich App 499, 509; 675 NW2d 847 (2003). By failing to address this claim of error in the trial court, defendant-mother allowed the disruption caused by holding a full evidentiary hearing, and she now asks this Court to reverse and restart the whole process due to this alleged error, which would cause still further disruption and delay. Under these facts, we conclude that this claim of error does not involve an exceptional circumstance that warrants disregarding preservation requirements. See *Napier v Jacobs*, 429 Mich 222, 227-237; 414 NW2d 862 (1987). Accordingly, we conclude that she has waived that claim of error. See *Tolas Oil & Gas Exploration Co*, ___ Mich App at ___ & n 3 (Docket No. 359090); slip op at 3 & n 3.

Defendant-mother argues that she is entitled to reversal because the GAL overstepped her authority throughout the litigation. Defendant-mother likewise did not take any steps to preserve this claim of error in the trial court. See *Glasker-Davis*, 333 Mich App at 227. She did not object to the GAL's reports, did not move to remove the GAL at any point, and did not object to the GAL's participation in the evidentiary hearing. A party who has not preserved a civil claim for appellate review has waived that claim of error. *Tolas Oil & Gas Exploration Co*, ___ Mich App at ___ & n 3; slip op at 3 & n 3. As plaintiff-father notes on appeal, it would be fundamentally unfair to allow defendant-mother to use this claim of error as an appellate parachute to overturn a hearing that was held over multiple days and took months to complete after acquiescing to the procedures in the lower court. For that reason, we decline to exercise our discretion to consider this unpreserved claim of error. See *Bailey*, 304 Mich App at 345-346.[4]

---

[4] As for the remaining claims of error asserted under this issue, defendant-mother did not have to take any special steps to preserve them. See MCR 2.517(A)(7); MCR 3.201(C).

## C. BEST-INTEREST FACTORS

When considering whether to alter custody, the trial court had to consider the best-interest factors enumerated in MCL 722.23. See MCL 722.26a(1)(a). The "best interests of the child means the sum total" of the enumerated factors, which are to be "considered, evaluated, and determined by the court." MCL 722.23. The trial court had to state its findings and conclusions for each of the factors when rendering its custody determination. See *MacIntyre v MacIntyre (On Remand)*, 267 Mich App 449, 451-452; 705 NW2d 144 (2005). Although the trial court was not required to discuss every "piece of evidence entered" and every "argument raised" by the parties, the record must "be sufficient for this Court to determine whether the evidence clearly preponderates against the trial court's findings." *Id*. at 452. The trial court was also not required to give equal weight to each factor; it could consider the relative weight of the factors as appropriate to the circumstances of the case before it. See *Sinicropi v Mazurek*, 273 Mich App 149, 184; 729 NW2d 256 (2006).

The parties do not contest that the referee properly found that AB had an established custodial environment with both parties and that the proposed change in custody would alter the established custodial environment. For that reason, plaintiff-father had the burden to establish by clear and convincing evidence that the change in custody was in the child's best interests. See *Griffin v Griffin*, 323 Mich App 110, 118-120; 916 NW2d 292 (2018). When resolving the motion to change custody, the trial court adopted the referee's proposed order in its entirety, and the referee's order incorporated the referee's written findings.

Defendant-mother challenges the trial court's findings for the best-interest factors. She suggests at the outset that the trial court erred when it failed to make its own findings of fact, rather than relying on the referee's findings. However, our Supreme Court has concluded that a court may—with some limitations not relevant to this case—rely on the hearing conducted by the referee and adopt the referee's findings. See MCR 3.215(F)(2); see also *Rivette v Rose-Molina*, 278 Mich App 327, 330; 750 NW2d 603 (2008) (stating that, if a referee makes adequate findings, the trial court may uphold those findings without making independent findings).

As detailed below, defendant-mother challenges the court's specific findings for the various best-interest factors. MCL 722.23 provides:

> As used in this act, "best interests of the child" means the sum total of the following factors to be considered, evaluated, and determined by the court:
>
> (a) The love, affection, and other emotional ties existing between the parties involved and the child.
>
> (b) The capacity and disposition of the parties involved to give the child love, affection, and guidance and to continue the education and raising of the child in his or her religion or creed, if any.
>
> (c) The capacity and disposition of the parties involved to provide the child with food, clothing, medical care or other remedial care recognized and permitted under the laws of this state in place of medical care, and other material needs.

-6-

(d) The length of time the child has lived in a stable, satisfactory environment, and the desirability of maintaining continuity.

(e) The permanence, as a family unit, of the existing or proposed custodial home or homes.

(f) The moral fitness of the parties involved.

(g) The mental and physical health of the parties involved.

(h) The home, school, and community record of the child.

(i) The reasonable preference of the child, if the court considers the child to be of sufficient age to express preference.

(j) The willingness and ability of each of the parties to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent or the child and the parents. A court may not consider negatively for the purposes of this factor any reasonable action taken by a parent to protect a child or that parent from sexual assault or domestic violence by the child's other parent.

(k) Domestic violence, regardless of whether the violence was directed against or witnessed by the child.

(l) Any other factor considered by the court to be relevant to a particular child custody dispute.

Factor (a) involves the "love, affection, and other emotional ties existing between the parties involved and the child." MCL 722.23(a). The referee found that defendant-mother had great love and affection for AB, but the referee also found that defendant-mother had caused AB's feelings to become enmeshed with defendant-mother such that the two often could not be separated. "That sort of bond," the referee found, could be "highly dangerous" for AB. For that reason, the referee found that this factor favored plaintiff-father. Defendant-mother first argues that it was "unusual" for the referee to find that Factor (a) favored plaintiff-father when this finding is ordinarily equal in custody disputes. She characterizes the referee's findings as brief, conclusory, and without reference to any facts. Defendant-mother's characterizations do not establish error. The court did not have to explain her findings with "overelaboration of detail or particularization of facts"; rather, it was enough to provide "[b]rief, definite, and pertinent findings and conclusions on the contested matters." MCR 3.215(E)(1)(a); cf. MCR 2.517(A)(2). Moreover, the trial court did not have to comment on each "item of evidence or argument raised by the parties;" its findings are sufficient if this Court can determine "whether the evidence clearly preponderates in the opposite direction." *McIntosh*, 282 Mich App at 474. Dr. Cotter testified that, unlike a normal child of her age, AB had a lack of separation and individuation from her mother, which was exemplified by her use of "the royal 'we' " when discussing certain matters involving her mother, such as dance. In other words, AB would use "we" instead of "I" when describing events and opinions associated with topics with which her mother was involved. AB also had a lot of separation anxiety related to her mother. Dr. Cotter opined that the level of shared

identity with her mother was learned, which strongly suggested that AB had learned her shared identity from her mother. Defendant-mother notes that Dr. Cotter also testified that AB had made good progress on her issues, but that testimony did not negate the evidence that defendant-mother had deliberately or unconsciously caused AB to have problems with a shared identity. Moreover, when Dr. Cotter's testimony is considered in light of defendant-mother's continued efforts to influence AB to marginalize her biological father's role in her life, the referee could reasonably find that this factor favored plaintiff-father.

Factor (b) asks the reviewing court to consider the "capacity and disposition of the parties involved to give the child love, affection, and guidance and to continue the education and raising of the child in his or her religion or creed, if any." MCL 722.23(b). "[T]his factor deals with the capacity and disposition of the parties, not whether each party has in fact had the opportunity to demonstrate that capacity and disposition." *Demski v Petlick*, 309 Mich App 404, 447-448; 873 NW2d 596 (2015). The referee found that both parties had the willingness and ability to foster their bonds with AB. The referee nevertheless found that defendant-mother's disposition needed to be redirected in a "healthier manner" that would allow the child to "have independent thoughts and feelings." Because defendant-mother's capacity needed to be redirected to healthier forms, the referee found that this factor favored plaintiff-father.

The referee could properly consider the evidence that defendant-mother had caused AB to have a shared identity with her when considering this factor. See *Fletcher v Fletcher*, 229 Mich App 19, 24-25; 581 NW2d 11 (1998) (noting that the factors have natural overlap and holding that the finder of fact could properly consider the inferences to be drawn from the evidence under multiple factors). There was evidence that, although defendant-mother clearly loved AB, she took actions that were harmful to the child. For example, even though AB had been ordered to stop calling her stepfather "daddy," defendant-mother continued to refer to him as AB's "daddy," which sent an improper message to AB. The fact that AB had her stepfather listed as "Dad" and father listed as "Mark" in her phone's contacts is also relevant. Defendant-mother chronically failed to recognize how her intransigence on this subject adversely affected AB. There was also evidence that defendant-mother enmeshed AB in the custody disputes by informing her about them and using AB as a pawn in the disputes. In particular, the testimony and evidence about the Halloween party and AB's distraught call to plaintiff-father allowed an inference that defendant-mother placed her own desire to win battles against plaintiff-father over AB's well-being. Examined as a whole, there was strong evidence to support the referee's finding that defendant-mother's capacity and disposition to provide AB with love and affection was hampered by her need to secure AB as an ally and use her in the battles against plaintiff-father. The referee correctly found that defendant-mother's capacity to provide affection needed to be redirected in "healthier" ways that would allow AB to develop into an independent person.

Defendant-mother makes much of the fact that the evidence showed that she had historically been the parent who took AB to medical and dental appointments. She also notes that she was the only parent who mentioned church and suggests that the referee erred under this factor because plaintiff-father had since requested a change from parochial school to public school. She also faults the referee for failing to discuss the problems that AB had blending into plaintiff-father's family. There was no evidence in the record that AB was not getting a proper education or that the parties did not support her development in the family's faith. Although there was evidence that AB had had parenting issues with plaintiff-father's new wife, the evidence did not

implicate plaintiff-father's capacity or disposition to provide love, affection, and guidance to AB and to continue her education and raising her in her religion. Indeed, the record showed that plaintiff-father had alone paid for AB's parochial school tuition. Additionally, as was evidenced by defendant-mother's aforementioned efforts to get AB to refer to her stepfather as "daddy," there were also issues involving AB blending into her mother's new family. The referee did not err by focusing on the primary issues that gave rise to the need for the hearing: namely, the evidence that defendant-mother had escalated her efforts to undermine AB's relationship with plaintiff-father. The evidence supported a finding that defendant-mother's inflexibility involving coparenting was the driving emotion affecting this factor and limited defendant-mother's ability to provide proper guidance.

Factor (c) asks the finder of factor to consider the parties' ability to provide for the child's material needs. Specifically, the finder of fact must consider the "capacity and disposition of the parties involved to provide the child with food, clothing, medical care or other remedial care recognized and permitted under the laws of this state in place of medical care, and other material needs." MCL 722.23(c). The referee found that the parties were equal because there was no evidence that AB's needs were not being met. Defendant-mother indicates that she should have been favored under this factor because she took AB to her medical appointments. There was no evidence that plaintiff-father lacked the *capacity and disposition* to provide AB with medical care and the fact that defendant-mother historically took AB to appointments did not permit an inference that he would neglect AB's medical needs. Additionally, whether the parties had the disposition to meet AB's medical needs was just one of several considerations under this factor. The record showed that AB's physical needs were met.

Defendant-mother argues that the referee erred when it found that Factor (d) was equal. Factor (d) requires the finder of fact to examine the "length of time the child has lived in a stable, satisfactory environment, and the desirability of maintaining continuity," MCL 722.23(d). "Factor (d) is properly addressed by considering the environments in which the child has lived in the past and the desirability of maintaining the continuity of those environments." *Demski*, 309 Mich App at 448-449. Defendant-mother argues that the court's "finding that neither household has had any significant disruptions" was "not supported by the record," but she does not cite any disruptions that rebut this finding. Defendant-mother also asserts that "[t]he CPS investigators could not rule out that the child had not [sic] been struck in the leg at" plaintiff-father's home, but this is a mischaracterization of the CPS findings. CPS determined that the allegations were not supported by a preponderance of the evidence and closed the matter; it would be impossible to definitively "rule out" the allegations, but CPS determined that they were not supported by credible evidence.

Defendant-mother argues that the referee erred when it found that Factor (e) was equal. Factor (e), asks the finder of fact to consider "the permanence, as a family unit, of the existing or proposed custodial home or homes," MCL 722.23(e). Defendant-mother asserts that "the child had a long-term established custodial environment with her mother." This is undeniably true, but it is also true of her custodial environment with her father. Defendant-mother also asserts that her "home was less disruptive than" plaintiff-father's because AB had "blended family issues with her stepmother." Issues with AB's relationship with her stepmother, many of which were fueled by defendant-mother's conduct, are not relevant to the *permanence* of the family unit. The evidence suggests that both parties were in stable relationships with their new spouses, so the trial court did not err by finding this factor equal.

Defendant-mother does not contest the court's findings that Factors (f), (g), and (h) did not favor either party.

Regarding Factor (i), reasonable preference of the child, defendant-mother argues that the trial court erred as a matter of law when it failed to separately interview AB to discover her preferences.[5]  However, defendant-mother cites no authority suggesting that a child must be subjected to a second interview if a party objects to the referee's recommendations.  Defendant-mother acknowledges that the referee interviewed AB and took AB's preferences into consideration, but she asserts that the trial court also had to interview AB and could not rely on the referee's interview.[6]  The trial court had to consider AB's reasonable preference under MCL 722.23(i).  Accordingly, defendant-mother has not demonstrated that there was an error involving Factor (i) that warrants relief.

Factor (j) pertains to the "willingness and ability of each of the parties to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent or the child and the parents."  Contrary to defendant-mother's contention on appeal, there was overwhelming evidence that defendant-mother had not only refused to encourage a healthy relationship between AB and plaintiff-father, she actively sabotaged plaintiff-fathers ability to facilitate this relationship, did everything within her power to turn AB against him, regularly attempted to turn AB into an ally in clashes with plaintiff-father, and tried to ensure that AB's stepfather would be the only father figure in AB's life.

Testimony established that AB routinely referred to her father by his first name and that defendant-mother encouraged that practice by her actions and statements around AB.  Defendant-mother also encouraged AB to refer to her stepfather as "daddy."  As noted, AB had her stepfather saved in her cell phone as "Dad" whereas plaintiff-father was saved as "Mark."  Indeed, there was evidence that, when at her mother's home, AB whispered to the GAL that she would like to have some more time with "Mark."  The evidence that AB did not feel free to state her actual preference at her mother's home and felt the need to refer to her father by his first name was strong evidence of the strain that defendant-mother's actions placed on AB.  Additionally, defendant-mother once took out an ad in the program for one of AB's dance recitals that included a picture of AB and referred to her stepfather as her dad.  When asked about this, plaintiff-mother suggested that this was compliant with contrary court orders because she was the one referring to her husband as AB's father, not AB herself.  Defendant-mother's own testimony showed that she minimized the problems involving the appellations and reverted to technicalities and sophistry to justify her continued failure to encourage AB to refer to her biological father as dad.  Defendant-mother's testimony about the ad that she took out in the dance program was emblematic of defendant-

---

[5] Notably, defendant-mother states that "[t]he court does not indicate whether it has interviewed the child," but even assuming it did not, this argument has no merit.

[6] Defendant-mother cites one case in which the court interviewed the children but did not weigh their preferences correctly, *Bowers v Bowers*, 198 Mich App 320, 332; 497 NW2d 602 (1993), and another case in which the child was not interviewed at all.  *Lewis v Lewis*, 73 Mich App 563, 566; 252 NW2d 237 (1977).  Neither case is on point.

mother's failure to recognize how her actions worked to marginalize plaintiff-father at AB's expense.

There was evidence that defendant-mother recruited AB to be an ally in her coparenting battles. As Zopf testified, defendant-mother created conflict so that AB could demonstrate her loyalty to her mother. The incident involving the Halloween party and the recorded phone call demonstrated how defendant-mother's actions positioned plaintiff-father to be viewed by AB as the mean and uncompromising parent. The fact that defendant-mother tried to use the recording in her battles over coparenting, when considered with the circumstances surrounding the recording, strongly suggested that defendant-mother staged the whole incident. The same was true of the testimony concerning the disputes over dance. The evidence suggested that defendant-mother always blamed plaintiff-father whenever AB was disappointed with being unable to participate in extra dance-related activities. Dr. Cotter testified that AB had been recruited into her mother's effort to create a preferred household, which created an unhealthy dynamic that compelled AB to develop more complex coping mechanisms. AB also felt compelled to defend her mother's actions. He noted too that defendant-mother shared a lot of information regarding parental conflicts with AB, especially regarding dance; this was evidenced in part by AB's increased use of the royal "we" when talking about dance. Zopf also testified about the problems surrounding dance and stated that defendant-mother had instructed AB to withhold information from her father.

Defendant-mother's efforts to undermine plaintiff-father's relationship with AB was further evidence by her attempts to get mandatory reporters to report AB's stepmother for abuse. Eventually, someone did report AB's stepmother to CPS, and there was an investigation in which the investigator found that the allegations were not supported by a preponderance of the evidence. The investigation revealed that AB had inconsistent versions of the events and could not recall details, even though the incident purportedly happened just days earlier. There was evidence that AB told others at school that she feared that she would not be able to return to her father's home as a result. A reasonable fact-finder examining the totality of the evidence could conclude that the entire CPS incident arose from the continuing effort by defendant-mother to paint plaintiff-father's household in a negative light, which escalated into a report to CPS. The evidence around defendant-mother's call to the police department to request a welfare check also permitted an inference that defendant-mother was escalating her efforts to attack plaintiff-father and alienate AB from him. The evidence showed that AB had a minor dispute with her stepmother over cleaning her room and surreptitiously contacted defendant-mother. The investigation revealed that AB was not in any danger and that there had not been any argument. The testimony suggested that even AB was shocked and confused by the police presence. Defendant-mother suggests that the referee erred to the extent that the referee used the evidence that she called the police department against her because the Legislature specifically provided that the court "may not consider negatively for the purposes of this factor any reasonable action taken by a parent to protect a child or that parent from sexual assault or domestic violence by the child's other parent." MCL 722.23(j). The evidence permitted an inference that defendant-mother exaggerated or fabricated the incident at issue in order to justify her decision to call the police department. As such, there was evidence that permitted the referee to conclude that defendant-mother was not taking a reasonable action to protect AB from domestic violence or sexual assault.

The referee's findings regaring factor (i)were well supported in the record. There was compelling evidence that defendant-mother had been engaging in acts designed to obstruct or

sabotage plaintiff-father's relationship with AB, which implicated AB's best interests. See *Martin v Martin*, 331 Mich App 224, 238-239 n 2; 852 NW2d 530 (2020). Simply put, the evidence suggests that no amount of expert testimony or court orders could deter defendant-mother from her obsession with excising plaintiff-father from AB's life.

Defendant-mother does not explicitly contest the court's finding that Factor (k), domestic violence, was equal; however, she notes that plaintiff-father "acknowledged that [defendant-mother] had previously alleged domestic violence" perpetrated by him. Plaintiff-father's testimony did not establish actual domestic violence—it only established that defendant-mother once alleged it. There was no evidence adduced at the hearing that plaintiff-father had engaged in any domestic violence.

The last factor, Factor (*l*), asks finder of fact to consider "[a]ny other factor . . . relevant to a particular child custody dispute." MCL 722.23(*l*). The referee weighed this factor in favor of plaintiff-father on the basis of defendant-mother's inability to recognize the harm that she had been inflicting on AB:

> Of concern to this court and relevant to this particular custody dispute is Defendant/Mother's inability to recognize how dangerous her own behavior is to AB's prediction of success as she continues to get older. It is clear from her testimony that Defendant/Mother loves this minor child and wishes to provide for her mentally and emotionally, however fails to see how her own actions will prevent her from doing so. The Defendant/Mother has proven that is she unable to navigate the appropriate channels. She uses semantics and technicalities to justify doing whatever it is she chooses to do without regard to the other parent in this situation. She has continued to undermine her own credibility with both her co-parenting actions/omissions and her evasive testimony regarding same. She forges ahead without concern for the consequences for [AB] that lie ahead.

Defendant-mother complains that this finding was unsupported and amounted to mere vilification. Contrary to defendant-mother's contention, the record supported the referee's finding that defendant-mother acted in ways that were harmful to AB and yet refused to recognize the harm or was unable to recognize the harm. Defendant-mother's incredible denials about her surreptitious contacts with AB, her claims that she did nothing wrong by referring to AB's stepfather as "daddy" in the dance program, and her testimony that she technically complied with the court's orders—even while undermining the goals—showed that she placed her own desire to obstruct and demean plaintiff-father over AB's welfare.[7] The fact that defendant-mother was unable or unwilling to

---

[7] On appeal, defendant-mother indicated that this Court should not defer to the finders of fact on matters of credibility because the hearings were conducted over Zoom. We reject that contention. Although the referee did not specifically find that defendant-mother generally lacked credibility, it is evident in the referee's findings that the referee found defendant-mother less credible. The trial court similarly expressed frustration with defendant-mother's indirect answers at the de novo hearing and warned her that her testimony undermined her own credibility. Both the referee and the trial court had innumerable interactions with defendant-mother in addition to the ability to

-12-

place AB's needs before her own wants was compelling evidence that it was not in AB's best interests for her parents to retain joint custody of AB.

Defendant-mother failed to establish any errors with respect to the best-interest factors.

Additional findings are necessary when legal custody is contested. Legal custody is governed by MCL 722.26a, which provides in relevant part:

> (1) In custody disputes between parents, the parents shall be advised of joint custody. At the request of either parent, the court shall consider an award of joint custody, and shall state on the record the reasons for granting or denying a request. In other cases joint custody may be considered by the court. The court shall determine whether joint custody is in the best interest of the child by considering the following factors:
>
> (a) The factors enumerated in section 3.
>
> (b) Whether the parents will be able to cooperate and generally agree concerning important decisions affecting the welfare of the child.

"If two equally capable parents whose marriage relationship has irreconcilably broken down are unable to cooperate and to agree generally concerning important decisions affecting the welfare of their children, the court has no alternative but to determine which parent shall have sole custody of the children." *Bofysil v Bofysil*, 332 Mich App 232, 249; 956 NW2d 544 (2020) (quotation marks and citation omitted).

The evidence suggests that defendant-mother is wholly unwilling to cooperate with plaintiff-father and actively thwarts his decision-making abilities; therefore, the court did not err by awarding plaintiff-father sole legal custody. As discussed extensively above, the evidence suggests that defendant-mother engaged in behaviors that marginalized plaintiff-father's role as a parent to AB and prevented AB from having a healthy relationship with her father. Defendant-mother's lack of insight into the harmful nature of her behavior was evidence that she would continue to engage in the same behaviors and continue to place AB's mental well-being at risk.

There was also ample evidence specific to cooperation and decision-making. In general, defendant-mother was defiant of court orders to the extent they afforded rights and authority to plaintiff-father and was, at one point, held in contempt of court. Over the course of the litigation, plaintiff-father was awarded thousands of dollars in attorney fees arising from his attempts to force defendant-mother's compliance with court orders, and these fees ultimately needed to be credited against his child support obligation because defendant-mother refused to pay. Defendant-mother also repeatedly failed to pay her shares of the GAL fees and therapy bills, and she refused to

---

observe her contemporaneously during the hearings, which provided them with greater context with which to judge her credibility notwithstanding that the hearings were held via telecommunications. See MCR 2.613(C). Accordingly, we defer to the clear indications that the referee and court found defendant-mother less credible. See *Martin*, 331 Mich App at 239.

document her volunteer work at AB's private school so that plaintiff-father would not receive a discount on tuition. Defendant-mother habitually reached agreements in coparenting counseling sessions then promptly breach the agreements. For example, defendant-mother frequently enrolled AB in more dance classes than agreed to, and at one point she sent plaintiff-father a redacted receipt for dance fees to conceal this extra enrollment. The parties were repeatedly ordered to communicate through a program called "Our Family Wizard," but defendant-mother repeatedly failed to do so. There was also evidence that defendant-mother unilaterally changed AB's medical providers without informing plaintiff-father.

The trial court's decision to grant plaintiff-father sole legal and physical custody of AB amounted to a principled resolution of the problems created by defendant-mother's conduct. As such, defendant-mother has also not shown that the trial court's decision to award plaintiff-father sole legal and physical custody amounted to a palpable abuse of discretion. See *Geering*, 320 Mich App at 188.

The trial court's adoption of the referee's findings and conclusions of law also supported the change in parenting time. Defendant-mother takes exception to the court's omission of explicit findings regarding the parenting-time factors, but the statute clearly states that those are factors that "[t]he court *may* consider," and it is well-established that "may" is a permissive term, see *Woodman v Dep't of Corrections*, 511 Mich 427, 442-443; 999 NW2d 463 (2023). MCL 722.27a(7) (emphasis added). Therefore, contrary to defendant-mother's suggestion on appeal, the trial court did not need to separately analyze the parenting-time factors so long as it was evident on the record that it made the parenting-time change in AB's best interests. See *Shade v Wright*, 291 Mich App 17, 31-32; 805 NW2d 1 (2010).

Defendant-mother has not identified any errors in the trial court's custody or parenting-time decisions that warrant relief.

## IV.  DOCKET NO. 367459: CHANGE OF SCHOOLS

Defendant-mother agues that the trial court abused its discretion by granting defendant-father's motion to change AB's school. We disagree.

At the outset, we address defendant-mother's contention that changing AB's school altered her established custodial environment. An established custodial environment is a place where "the child naturally looks to the custodian in that environment for guidance, discipline, the necessities of life, and parental comfort." MCL 722.27(1)(c). AB does not look to her parents "for guidance, discipline, the necessities of life, and parental comfort" at school. Changing AB's school in no way impacted her parenting-time schedule. Therefore, this argument is without merit. Defendant-mother also argues that plaintiff-father failed to establish proper cause or change of circumstances, but plaintiff-father was not attempting to change custody. To reiterate: the parenting-time schedule was not altered. Therefore, he did not need to establish proper cause or change of circumstances. This also renders any discussion of the best-interest factors unnecessary, regardless of the court's decision to consider some of them.

Plaintiff-father has sole legal custody of AB, and in general, parents with sole legal custody of a child do not need permission from anybody to change the child's school. See *Grange Ins Co of Mich v Lawrence*, 494 Mich 475, 511; 835 NW2d 363 (2013) (explaining that "legal custody is understood to mean decision-making authority as to important decisions affecting the child's welfare"); *Marik v Marik*, 325 Mich App 353, 360; 925 NW2d 885 (2018) (including "a change of the child's school" as an example of an "important decision[] affecting the welfare of the child"). However, the court exercised its discretion to include a provision requiring that AB "shall remain in her current school unless otherwise ordered by the Court" in its custody order. The court's decision to change its order with respect to AB's schooling was also an exercise of discretion, and such decisions are reviewed for abuse of discretion. MCL 722.28. Therefore, the question before us is whether the trial court's decision to grant plaintiff-father's motion to change schools was "so palpably and grossly violative of fact and logic that it evidences a perversity of will, a defiance of judgment, or the exercise of passion or bias." *Geering*, 320 Mich App at 188.

There was ample evidence to support the trial court's decision. The trial court held an evidentiary hearing to determine whether to grant plaintiff-father's request. At the hearing, Dr. Cotter testified that AB would be building the foundations of friendship with students that will accompany her to high school over the next couple of years. It was, he opined, easier for children to make the transition in sixth grade than to do so in high school. If AB were tracked to go to high school in Royal Oak, it would make sense in Dr. Cotter's view to transition her to Royal Oak Middle School now rather than later. Dr. Cotter stated that the transition from eighth grade to ninth grade involves the greatest level of risky behaviors, and having a stable peer group helps mitigate the at-risk behaviors. Zopf also testified that it would be in the best interests of AB to transfer schools.[8] She opined that the Catholic school made sense when it was equidistant between the parties and they shared equal parenting time. Defendant-mother had, however, moved since then and plaintiff-father had more parenting time. It made sense, Zopf stated, to move AB's school so that she would have more time for friends, academics, and doing things that children do. Defendant-mother presented evidence that AB had done well at her current school and that it was an excellent institution, but she did not present any evidence that the change in school would harm AB.

Therefore, the trial court's decision to allow plaintiff-father to change AB's school, as the parent with sole legal and physical custody, was not an abuse of discretion.

---

[8] This testimony was consistent with a report Zopf filed regarding the matter.

## V. CONCLUSION

Defendant-mother has not established that the trial court erred in any respect when it awarded sole legal and physical custody of the minor child to plaintiff-father and established a parenting-time schedule for defendant-mother. Defendant-mother also has not shown that the trial court erred when it authorized plaintiff-father's decision to change AB's school.

Affirmed in both dockets. Plaintiff-father, being the prevailing party, may tax costs. See MCR 7.219(A).

/s/ Mark J. Cavanagh
/s/ Kathleen Jansen
/s/ Allie Greenleaf Maldonado